## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No.  23-cr-428-BAH** |
| | : | |
| **DONOVAN BRAXTON, JR.** | : | |
| | : | |
| **Defendant.** | : | |

## MOTION TO SUPPRESS FRUITS OF WARRANTLESS SEARCH AND SEIZURE

Defendant Donovan Braxton ("Mr. Braxton"), by and through his counsel, Michael E. Lawlor, Adam C. Demetriou, and Brennan, McKenna & Lawlor, Chtd., respectfully moves pursuant to Federal Rule of Criminal Procedure 12(b)(3) to suppress any and all evidence obtained pursuant to the warrantless search and seizure of his person and vehicle by members of the Metropolitan Police Department on March 29, 2023. The warrantless search and seizure were conducted in violation of the Fourth Amendment to the United States Constitution. Mr. Braxton also moves to suppress any evidence derived from the March 29, 2023 warrantless search and seizure. Mr. Braxton respectfully requests an evidentiary hearing on this Motion.

### I.   Procedural History

On March 29, 2023, in the rear alley of 5026 Sheriff Road in Northeast Washington, D.C., Metropolitan Police Department ("MPD") officers Anthony

1

Willis and Michael Nava executed a warrantless arrest of Donovan Braxton. The officers recovered a firearm from Mr. Braxton's person. On March 30, 2023, Mr. Braxton was charged in the Superior Court of the District of Columbia with firearms offenses. *See United States v. Braxton*, No. 2023-CF2-001891. Mr. Braxton remained detained until April 3, 2023. On that date, Mr. Braxton appeared before D.C. Superior Court Magistrate Judge Renee Raymond for a preliminary hearing and detention hearing. The Superior Court found probable cause to support the charges and allowed the prosecution to continue. However, the Superior Court also denied the Government's request for detention and ordered Mr. Braxton released from custody pending trial.

On December 7, 2023, the Government obtained an Indictment charging Mr. Braxton in this Court with unlawful possession of a firearm and ammunition by a person previously convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) That same day, on the basis of the Indictment, United States Magistrate Judge Robin M. Meriweather issued a warrant for Mr. Braxton's arrest. On December 19, 2023, ATF Special Agent Steven Letteney and others arrested Mr. Braxton at his home at 4621 Boston Way in Lanham, Maryland. Later that day, Mr. Braxton appeared before United States Magistrate Judge Zia M. Faruqui for an initial appearance. The Government moved to detain Mr. Braxton pending trial. On December 21, 2023, Mr.

Braxton appeared before Judge Faruqui for an arraignment. At that hearing, Mr. Braxton consented to detention. On May 29, 2024, the parties filed a Joint Status Report (ECF No. 17) indicating that Mr. Braxton would be filing a motion to suppress and requesting a scheduling order. The Court set briefing deadlines and scheduled a motions hearing for September 13, 2024.

At this time, Mr. Braxton moves to suppress the fruits of the March 29, 2023 warrantless search and seizure of his person and vehicle, as well as any evidence derived therefrom.

## II.   Legal Standard

Judge Walton of this Court has recently summarized the familiar legal standard applicable to motions to suppress the fruits of warrantless searches and seizures.

> The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. Because of this protection, "all seizures, even ones involving only a brief detention short of traditional arrest," must be "founded upon reasonable, objective justification." *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015) (internal quotations and citations omitted); *see also United States v. Mendenhall*, 446 U.S. 544, 551 (1980) ("The Fourth Amendment's requirement that searches and seizures be founded upon an objective justification, governs all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.") (quotations and citations omitted). In moving to suppress evidence for alleged Fourth Amendment violations, a defendant generally "has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or

seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) (citations omitted). "However, '[w]hen a defendant establishes that he was arrested or subjected to a search without a warrant,' as is undisputedly the case here, 'the burden then shifts to the government to justify the warrantless search.'" *United States v. Gibson*, 366 F. Supp. 3d 14, 19-20 (D.D.C. 2018) (alteration in original) (quoting *United States v. Williams*, 878 F. Supp. 2d 190, 197 (D.D.C. 2012)). In other words, "[b]ecause the [officers] in this case did not act pursuant to a warrant, the government bears the burden of showing that [the officers'] interaction with [the defendant] passes constitutional muster." *United States v. Jones*, 142 F. Supp. 3d 49, 56 (D.D.C. 2015).

*United States v. Winecoff*, No. 20-266 (RBW), 2021 U.S. Dist. LEXIS 248279, at *9

(D.D.C. Dec. 30, 2021).

It bears emphasizing that "searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions." *United States v. Vinton*, 594 F.3d 14, 19 (D.C. Cir. 2010) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993)). Indeed, "[a] warrantless search is the quintessential intrusion and is presumptively unreasonable." *United States v. Peyton*, 745 F.3d 546, 552 (D.C. Cir. 2014). "When a defendant establishes that he was arrested or subjected to a search without a warrant, the burden then shifts to the government to justify the warrantless search." *United States v. Williams*, 878 F. Supp. 2d 190, 197 (D.D.C. 2012) (collecting cases).

### III.  Factual Background

At 4:44 p.m. on March 29, 2023, an anonymous man placed a call to D.C.
911. *See* Ex. A (D.C. 911 Dispatch Event Chronology). The Government has
produced a recording of the call in discovery. *See* Ex. B (911 Call Recording).[1] The
contents of the 911 call are as follows:

> Automated Voice: D.C. 911
>
> Dispatcher ("D"): What's the address of the emergency?
>
> Caller ("C"): Yeah, may I have, um, the, police cruisers respond to the
> rear of the address of 5026 Sheriff Road in Northeast Washington,
> D.C.? It looks like, uh, there's a black SUV that's pulling a trailer.
> Looks like it's getting ready to possibly, uh, steal a car in the back of
> that address, or, or possibly the vehicle that's, uh, back there, it may be
> stolen. That, uh, house – it's been a lot of stolen vehicles in that area,
> so I just want to have a – it looks suspicious. I wanted to have a police
> cruiser respond in the rear of that address, in the back of that address:
> 5026 Sheriff Road, Northeast Washington, D.C.
>
> D: Ok, is anyone inside of the vehicle?
>
> C: Yes.
>
> D: Any weapons [inaud.] –
>
> C: In the vehicle, uh, I have no idea. The vehicle is a black SUV, four
> door with tinted windows, and it's pulling a trailer. And it just looks
> suspicious because it's like –
>
> D: Would you like to provide your name and your callback number?
>
> C: No, ma'am.
>
> D: Do you see the person inside the location, inside of the vehicle?
>
> C: No, ma'am.
>
> D: Alright. And would you happen to have a license plate number?
>
> C: No, ma'am.

---

[1] This digital exhibit will be loaded onto a USB drive and submitted to the Court.

D: Alright, I have a call sent for dispatch. If anything changes, give us a call back immediately.

C: Alright, thank you.

D: You're welcome.[2]

At 4:46 p.m., a unit from MPD's Sixth District was dispatched to respond in reference to the call. Unit 6022E, which consisted of MPD Officers Anthony Willis and Michael Nava, who were traveling together in a marked police cruiser, indicated that it was available to respond to calls for service. The Sixth District radio dispatcher directed as follows: "Check the, uh, rear of 5026 Sheriff Road. [Inaud.] advised, um, a black SUV is trying to pull a trailer, possibly trying to seal it. Black SUV, tinted windows." *See* Ex. C (6D-Radio audio recording at 00:14 to 00:31).[3]

Officers Willis and Nava made their way to the rear of 5026 Sheriff Road in a marked police cruiser. Officer Willis was driving, and Officer Nava was seated in the front passenger seat. Both officers were equipped with and had activated body-worn camera devices. At approximately 5:01:41 p.m., Officer Willis turned his car into the alleyway leading to the rear of the address and drove towards a black SUV. Officer Willis came to a stop in the alley. Both officers got out of the cruiser, at which time Mr. Braxton was seated in in the driver's seat of the black SUV. Officer

---

[2] The Government has not provided a draft or official transcription of the 911 call. The transcription above has been produced to the best of the undersigned counsel's ability.

[3] This digital exhibit will be loaded onto a USB drive and submitted to the Court.

Willis called to Mr. Braxton: "Hey, how are you doing, sir? You good?" *See* Ex. D (Willis BWC Part 1 at approximately 17:01:51).[4] Below is a still shot from Officer Willis' body-worn camera footage depicting Mr. Braxton seated in the SUV at the time Officer Willis got out of the cruiser.



The Officers then walked towards the black SUV. While walking, Officer Willis asked Mr. Braxton whether he was trying to "pull your tractor out." Mr. Braxton's response is not audible in the body-worn camera footage. Officer Willis then stated, "yeah, we got a call" and asked Mr. Braxton "does this belong to you?"

---

[4] This digital exhibit will be loaded onto a USB drive and submitted to the Court.

Mr. Braxton responded, "yes, I just bought it." Officer Nava asked whether Mr. Braxton had "just bought it right now." Mr. Braxton then turned himself towards the passenger side of the car, grabbed a document, and reached out of the vehicle to hand the document to the officers.



Officer Willis then approached Mr. Braxton and took the document. While handing Officer Willis the document, Mr. Braxton asked, "y'all got a call for what?" Officer Nava responded: "Someone just picking up, uh, I guess like, I guess what you're picking up." Mr. Braxton stated that the house belongs to his family members. Officer Willis reviewed the document, which is entitled Maryland Certificate of Title.



While Officer Willis had the Certificate of Title in his hands, he asked Mr. Braxton for his name. Mr. Braxton responded: "Donovan Braxton." Mr. Braxton then handed Officer Willis his D.C. driver's license.



While Officer Willis reviewed the Certificate of Title and driver's license, Officer Nava walked to the back of the trailer. *See* Ex. E (Nava BWC part 1 at approximately 17:02:40).[5] Officer Willis then directed Mr. Braxton to turn off the SUV while the officers made sure "everything [was] straight." Mr. Braxton complied. Mr. Braxton opened the driver's side door while the officers stood nearby. Officer Willis asked Officer Nava whether there was "a tag on the back of that." Officer Nava indicated that there was an Oregon tag on the SUV but not on the trailer. Mr. Braxton stated that he had just bought the trailer and that the vehicle belonged to one of his friends. Officer Willis continued to review the Certificate of Title and Mr. Braxton's driver's license. Officer Nava asked whether the title was for the trailer. Mr. Braxton indicated in the affirmative. Mr. Braxton then showed the officers his cell phone and scrolled through the screen, indicating that he had been messaging with the person from whom he had purchased the trailer.

---

[5] This digital exhibit will be loaded onto a USB drive and submitted to the Court



Officer Nava asked about the Oregon tag on the SUV. Mr. Braxton responded that he had just obtained the trailer that very day but that the tag on the SUV was legitimate. Officer Willis asked Mr. Braxton to show him where the VIN was located on the trailer. While still seated in the driver's seat of the SUV, Mr. Braxton responded that it was located on the side of the trailer. Officer Willis then asked Mr. Braxton to show him and gestured with his hands for Mr. Braxton to get out of the SUV.



Mr. Braxton complied. With one foot out of the car, he pulled down his hoodie, which was bunched up on his waist because he had been seated.



Mr. Braxton walked towards the back of the SUV, stepped off of the pavement into a gravel-filled area, and pointed out the VIN number on the trailer. Officer Nava remained near the front driver's side door of the SUV.



Officer Willis held the Certificate of Title and driver's license in his hand and appeared to compare the trailer's VIN to information printed on the certificate and to study the certificate further. As Officer Willis read information aloud, Mr. Braxton bent over again to point towards him to the trailer's VIN.



Mr. Braxton extended his hand to retrieve the certificate. At that point, Officer Willis stated: "Let me ask you something –" He interrupted his thought to call out to Officer Nava, who was still standing by the driver's side of the SUV. Officer Willis directed Officer Nava to approach.



While Officer Nava was approaching Mr. Braxton from behind, Officer Willis asked Mr. Braxton: "Do you have any weapons on you, man?" Mr. Braxton responded that he did not. Officer Willis moved in closer towards Mr. Braxton and extended his hand. Mr. Braxton protested the officer's attempt to touch him and asked Officer Willis to back up. Officer Willis placed the title and driver's license down on the trailer. Officer Willis then grabbed Mr. Braxton's arm, first with one hand and then with both.





Officer Willis gestured to Officer Nava with a head nod. Officer Nava then grabbed Mr. Braxton. A struggle ensued. The officers tackled Mr. Braxton to the ground. The officers directed Mr. Braxton to put his hands behind his back. Mr. Braxton called out for his aunt. At approximately 5:05:53 p.m., while Mr. Braxton was on the ground, Officer Willis' body-worn camera was disabled. Officer Willis' body-worn camera began recording video again at 5:08 p.m. *See* Ex. F (Willis BWC Part 2).[6] It began recording audio at 5:10 p.m. Officer Nava's body-worn camera was disabled at approximately 5:05:26 p.m. Officer Nava's body-worn camera began recording video again at 5:06 p.m., and it began recording audio at 5:08 p.m. *See* Ex. G (Nava BWC Part 2).[7]

---

[6] This digital exhibit will be loaded onto a USB drive and submitted to the Court.

[7] This digital exhibit will be loaded onto a USB drive and submitted to the Court.

Officers Willis and Nava held Mr. Braxton on the ground and called for additional officers. At 5:09 p.m., after other officers arrived on scene, Mr. Braxton was handcuffed. The officers recovered a firearm from Mr. Braxton's waistband. Mr. Braxton was placed into a police cruiser and transported from the scene. While other officers were preparing to transport Mr. Braxton, Officer Willis directed Officer Daniel Houng to run a check on the SUV's license plate. Officer Wills also retrieved Mr. Braxton's driver's license and the title to the trailer, which had been left on the trailer. Officer Houng, Officer Andre Williams, and others discussed calling a K-9 unit to the scene to conduct a sniff of the vehicle. Officers Houng and Williams disabled their body-worn camera devices at 5:33 p.m., before any K-9 unit had responded. By the time both officers activated their body-worn cameras again at 5:36 p.m., they had decided to search Mr. Braxton's vehicle. The search began at approximately 5:38 p.m.[8] Neither officer's footage depicts a K-9 sniff. At this time, Mr. Braxton is not aware of whether a K-9 sniff was conducted.[9]

---

[8] Mr. Braxton is not aware of whether the Government intends to introduce at trial any evidence seized as a result of the search of the black SUV. Pursuant to Rule 12(b)(4), Mr. Braxton requests that the Government notify him if it intends to introduce any such evidence.

[9] Another officer, Robert Murphy, recorded body-worn camera footage during the three minutes that Officer Houng and Officer Williams were not recording. Officer Murphy's footage does not depict a K-9 sniff.

Later that evening, Office Willis swore out an affidavit in support of Superior

Court firearms charges against Mr. Braxton.[10] *See* Ex. H (Gerstein Aff.).

## IV.   Officers Did Not Have Reasonable Articulable Suspicion to Seize Mr. Braxton

As the D.C. Circuit has recently summarized:

> Although the Fourth Amendment generally requires that officers have
> probable cause and a warrant to seize an individual, they need neither
> probable cause nor a warrant to briefly detain a citizen where they
> ha[ve] a reasonable, articulable suspicion that criminal activity may be
> afoot. To seize[] a person on less than probable cause, a police officer .
> . . must be able to point to specific and articulable facts which, taken
> together with rational inferences from those facts, support a reasonable
> and articulable suspicion that the person seized is engaged in criminal
> activity. The government bears the burden to provide evidence
> sufficient to support reasonable suspicion.

*United States v. Delaney*, 955 F.3d 1077, 1081 (D.C. Cir. 2020) (citations omitted).

In this case, the record will demonstrate that Officers Willis and Nava did not have

reasonable articulable suspicion of criminal activity sufficient to support the seizure

of Mr. Braxton.

As an initial matter, this Court will need to determine when the Fourth

Amendment seizure occurred. "A Fourth Amendment seizure occurs 'when physical

force is used to restrain movement or when a person submits to an officer's show of

authority.'" *Delaney*, 955 F.3d at 1081 (citing *United States v. Brodie*, 742 F.3d

---

[10] Mr. Braxton was not charged with any motor vehicle or stolen property-related offenses.

1058, 1061, (D.C. Cir. 2014)). "A show of authority sufficient to constitute a seizure occurs where the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business, or, put another way, where a reasonable person would have believed that he was not free to leave." *Delaney*, 955 F.3d at 1081. "Factors considered in assessing whether an officer's actions amounted to a show of authority include whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the encounter, and whether the officer's use of language or tone of voice indicat[ed] that compliance with the officer's request might be compelled." *United States v. Castle*, 825 F.3d 625, 632-33 (2016) (internal citations omitted).

Mr. Braxton submits that Officers Willis and Nava seized him when their marked police cruiser came to a stop perpendicular to his black SUV in a narrow residential alleyway and the uniformed officers immediately engaged Mr. Braxton in questioning. "Although the presence of a police car [by itself] is an insufficient show of authority to make a reasonable, innocent person feel unfree to leave[,] additional circumstances' beyond the mere presence of [the officers'] car . . . would have communicated to a reasonable person in [the defendant]'s position that he was not at liberty to ignore the police presence and go about his business[.]" *United States v. Winecoff*, No. 20-266 (RBW), 2021 U.S. Dist. LEXIS 248279, at *13 (D.D.C.

Dec. 30, 2021) (citations omitted). Here, Officer Willis drove his marked police cruiser into the narrow alleyway where Mr. Braxton's vehicle was stopped. Rather than stop outside on a side street and walk up the alleyway on foot, Officer Willis drove his car towards Mr. Braxton's vehicle and stopped a short distance away from it. Courts have found Fourth Amendment seizures where police officers park their cars distances of three, *Delaney*, 955 F.3d at 1082, and ten, Winecoff, 2021 U.S. Dist. LEXIS 248279, at *13, feet from a defendant's car.



Moreover, from the body-worn camera footage, it is clear that Mr. Braxton's vehicle would have needed to execute "a number of turns" in order to leave the scene, *Delaney*, 955 F.3d at 1083, a fact highly suggestive of a seizure. Additionally, at the time the officers stopped their marked cruiser mere feet from Mr. Braxton's vehicle, Mr. Braxton would reasonably have understood that "that the officers' focus

was directed at him and he was 'not at liberty to ignore the police presence and go about his business.'" *Winecoff*, 2021 U.S. Dist. LEXIS 248279, at *15 (citing *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). Mr. Braxton's vehicle was the *only* vehicle in the residential alleyway at the time the officers approached the SUV and stopped their cruiser. As soon as Officer Willis stopped his car, he and Officer Nava got out and began questioning Mr. Braxton about the tractor as they walked towards him. Where uniformed officers parked their marked police cruiser perpendicular to Mr. Braxton's large SUV in a narrow alleyway of a residential side street and effectively blocked the SUV's ability to move, Mr. Braxton was seized within the meaning of the Fourth Amendment. Mr. Braxton would have reasonably believed that this show of authority was directed at him – his was the only vehicle in the alleyway, and he was the only occupant of the vehicle. Mr. Braxton submitted to the officers' show of authority. He did not get up and run away. He sat in the SUV and answered the officers' questions.

The officers engaged in subsequent shows of authority that provide evidence of Mr. Braxton's seizure well before either officer touched him. At the time the officers stopped their car in front of Mr. Braxton's vehicle and approached him on foot, the engine of Mr. Braxton's SUV was running. Mr. Braxton handed the officers a title certificate for the trailer as well as his driver's license. Certainly, Mr. Braxton was not free to drive away while a uniformed officer held his driver's license in his

hands. To do so would have been to commit a motor vehicle violation. Additionally, at 5:02 p.m., Officer Willis asked Mr. Braxton to turn off his vehicle. Mr. Braxton complied. Other courts have held that a defendant is seized for Fourth Amendment purposes when he complies with an officer's direction to turn off his car. *United States v. Harrison*, No. 17-228, 2018 U.S. Dist. LEXIS 157805, at *14-15 (E.D. Pa. Sep. 17, 2018) ("Harrison was seized when he complied with Officer Wright's direction to turn off his car . . . In order to end the encounter, Harrison would have had to ignore Officer Wright's instruction and ask the officers to go back to their car and drive away. A reasonable person would not feel free to do so.") So too here. Officer Willis directed Mr. Braxton to turn off his car while the officers "made sure everything was straight." A reasonable person in Mr. Braxton's position would not have felt free to demand the return of his license and certificate of title, ask the officers to return to their car, and maneuver the SUV out of the narrow alleyway in order to end the encounter.

At 5:04 p.m., Officer Willis directed Mr. Braxton to get out of the SUV and show him where the VIN in the tailer was located. The D.C. Circuit has held that "ordering the occupants out of a parked car and requesting identification from them, constitutes an investigative seizure which must, at a minimum, meet the requirements of *Terry* to pass constitutional muster." *United States v. Foster*, 566 F. Supp. 1403, 1410 (D.D.C. 1983). Here, when Officer Willis first asked Mr. Braxton

where the VIN was located, Mr. Braxton responded that it could be found on the side of the trailer. Officer Willis then gestured towards Mr. Braxton and asked him to get out of the car and show him the VIN. Mr. Braxton complied. Mr. Braxton had already been stopped by uniformed officers in a narrow alleyway. One of the officers had his driver's license. He had been ordered to turn off his vehicle. Officer Willis reiterated that he wanted Mr. Braxton to get out of the SUV and show him the VIN. A reasonable person in Mr. Braxton's position would not have felt at liberty to reject the officer's demand, request the return of his property, ask the officers to return to their vehicle, and maneuver out of the alleyway.

At the next step of the Fourth Amendment analysis, this Court must determine whether, at the time of the seizure, the officers possessed specific and articulable facts to support a reasonable and articulable suspicion that Mr. Braxton was engaged in criminal activity. The Government will not be able to meet its burden. The anonymous 911 call did not give rise to reasonable articulable suspicion sufficient to support the seizure of Mr. Braxton. As an initial matter, it does not appear that either officer heard the 911 call itself. Even if the officers did, the anonymous tip in this case does not bear sufficient indicia of reliability to support a *Terry* seizure. *E.g.*, *Fla. v. J.L.*, 529 U.S. 266 (2000). Here, an anonymous caller requested that a police cruiser respond to the rear of 5026 Sheriff Road because he believed that there was an SUV pulling a trailer that looked like it was "possibly" getting ready to steal a car

or that "possibly" the SUV itself had been stolen. The called stated that there had been "a lot of stolen vehicles in that area," but did not provide the basis of that assertion. Nor did the caller provide a license plate number. Rather than an observation of criminal activity, the anonymous caller reported mere speculation that the SUV might possibly be involved in criminal activity. The caller of course refused to leave his name or call back number.[11] The fact that officers indeed located a black SUV pulling a trailer when they arrived on scene does not show that the anonymous "tipster ha[d] knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable *in its assertion of illegality*, not just in its tendency to identify a determinate person." *Fla. v. J.L.*, 529 U.S. 266, 272 (2000) (emphasis added). Such indicia are wholly lacking from the anonymous tip at issue in this case. The brief Sixth District radio broadcast repeated the anonymous caller's rank speculation of criminal activity, announcing merely a report of a black SUV "*possibly*" trying to steal a trailer. Law enforcement had no information supporting a reasonable inference that either the SUV or the tailer had been stolen.

To the extent the Government argues that Mr. Braxton's purported actions upon seeing the officers approach in their cruiser provide reasonable articulable

---

[11] Unlike in other cases in which the D.C. Circuit has held that an anonymous tip provided officers with reasonable articulable suspicion for a *Terry* seizure, here, the caller did not make his report in person. *Cf.* United States v. Thompson, 234 F.3d 725, 729 (D.C. Cir. 2000).

suspicion of criminal activity, the Government is mistaken. In the Gerstein affidavit, Officer Willis swore that "Defendant Braxton [sic] eyes appeared to widen once he observed MPD members pulling in the alleyway. He then jumped inside the black pickup truck and closed the door." As an initial matter, these events are not depicted on the body-worn camera footage. Moreover, it is highly doubtful that Officer Willis could observe Mr. Braxton's eyes "widen" from the entrance of the alleyway. As shown in the body-worn footage, Mr. Braxton was wearing sunglasses. When recounting the events to other MPD officers on scene, including Officer Williams, Officer Willis makes no mention of Mr. Braxton's eyes widening.[12] Additionally, at 5:16 p.m., when Officer Houng asked Officers Willis and Nava what happened at the scene, Officer Nava indicated that Mr. Braxton has been in the car when the officers approached. Officer Willis then interjected that Mr. Braxton had been outside of the car and then hopped in the car once he saw the officers. This inconsistency too casts doubt on Officer Willis' claims. Regardless, even if Mr. Braxton did enter the SUV upon seeing the officers, that action was reasonable and in no way indicative of criminal activity. It was reasonable for Mr. Braxton to believe that the officers urgently needed to make their way past his vehicle to the other side of the alleyway. In order for them to do so, Mr. Braxton would have had to move his

---

[12] This interaction took place at approximately 5:21 p.m. Officer Willis had deactivated his body-worn camera at the time. Officer Williams, however, was recording.

vehicle. Once the cruiser came to a stop mere feet from Mr. Braxton's vehicle, it was clear that the officers were there to investigate him. Mr. Braxton submitted to the show of authority and remained on scene, answering the officers' questions. *See, e.g.*, *Winecoff*, 2021 U.S. Dist. LEXIS 248279, at *22 (rejecting the Government's argument that a defendant's "nervous reaction" including "becoming wide-eyed" upon seeing officers provided reasonable articulable suspicion to support *Terry* stop and noting that "[b]eyond mere susceptib[ility to] an innocent explanation[,] the government's evidence does not establish that the officers witnessed conduct [that] was by itself lawful, but [that] also suggested that the [defendant] was engaged in some kind of unlawful activity") (citations omitted).

The officers' unparticularized suspicions and hunches cannot satisfy *Terry's* reasonable articulable suspicion standard. The fruits of the warrantless seizure of Mr. Braxton must therefore be suppressed.

## V.   Officers Arrested Mr. Braxton Without a Warrant and in the Absence of Probable Cause

As set forth above, Mr. Braxton was already illegally seized before the time he was directed out of his vehicle to show Officer Willis the VIN on the trailer. Accordingly, any evidence obtained as a result of the illegal seizure must be suppressed. However, there is an additional basis to suppress the fruits of the warrantless search and seizure of Mr. Braxton. Namely, when the officers grabbed

Mr. Braxton and tackled him to the ground, they effectuated an unlawful warrantless arrest that was not supported by probable cause. A warrantless arrest is lawful only where it is "based upon probable cause to believe that a crime was being committed." *United States v. Wesley*, 293 F.3d 541, 545 (D.C. Cir. 2002). "Probable cause to arrest requires the existence of facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person in believing that the suspect has committed, is committing, or is about to commit an offense." *Id.* (citations omitted). "Probable cause is a higher standard than that required for *Terry* stops." *United States v. Belton*, No. 18-246 (RMC), 2019 U.S. Dist. LEXIS 24995, at *9 n.10 (D.D.C. Feb. 15, 2019) (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)); *see also United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007) (noting that the standard for reasonable suspicion is "significantly lower" than that of probable cause).

In assessing whether officers had probable cause to effectuate the warrantless arrest, this Court "must consider the facts and circumstances within [the arresting officer's] knowledge and of which they had reasonably trustworthy information." *United States v. Smith*, 373 F. Supp. 3d 223, 242 (D.D.C. 2019) (citations omitted). Where a defendant "produces evidence that he was arrested or subjected to a search without a warrant . . . the burden shifts to the government to justify the warrantless arrest or search." *Id.* at 236 (citations omitted). The Government will not be able to

meet its burden to show that Officer Willis had probable cause to believe Mr. Braxton had committed an offense at the time he effectuated the arrest.

Mr. Braxton anticipates that the Government will argue that the officers' application of physical force against Mr. Braxton occurred in the course of a legitimate *Terry* seizure rather than an arrest. Not so. As an initial matter and as argued above, the *Terry* seizure was unlawful at its inception. Moreover, "[a] *Terry* stop must (1) last no longer than is necessary to effectuate the purpose of a stop and (2) employ the least intrusive means reasonably available to verify or dispel the officer's suspicion." *Smith*, 373 F. Supp. 3d at 238 (citing *Florida v. Royer*, 460 U.S. at 500 (plurality opinion). "[A] stop that is unduly prolonged or intrusive transforms from an investigative stop into an arrest requiring probable cause." *Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017). "In examining the reasonableness of the force used in making a stop, courts have considered such factors as the time of day, the 'high crime' nature of the area, a tip that the suspect may be armed, furtive hand movements, flight or attempted flight, a pressing need for immediate action, and the involvement of drugs." *United States v. Clark*, 24 F.3d 299, 302 (D.C. Cir. 1994).

The circumstances of this case demonstrate that Officer Willis arrested Mr. Braxton when he grabbed him. As is clear from the body-worn camera footage, Mr. Braxton was arrested in broad daylight in a residential alleyway. Officer Willis has

never described the quiet neighborhood as a high crime area. The anonymous called made no mention of a firearm or any drug activity. As noted below, officers had no reason to believe that Mr. Braxton was armed or dangerous. The two officers uniformed officers employed highly intrusive means to arrest Mr. Braxton, grabbing him from both the front and back and tackling him to the ground. To the extent the Government argues that Mr. Braxton's purported attempt to flee justified the intrusive means, the Government's argument misses the mark. The body-worn camera clearly shows that Mr. Braxton calmly but definitively protested Officer Willis' attempt to touch him. Mr. Braxton indicated his lack of consent by telling Officer Willis to back up. He *did not* run away. Even after Officer Willis grabbed Mr. Braxton's arm and while still holding onto it, Mr. Braxton remained in place and stated that he had done nothing wrong. At that point, Officer Nava grabbed Mr. Braxton from behind, and the officers tackled Mr. Braxton to the ground. This Court should conclude that Mr. Braxton was indeed arrested.

The officers arrested Mr. Braxton without probable cause. Mr. Braxton's actions leading up to the arrest were not indicative of those of an armed individual, and the officers did not conduct their interactions with Mr. Braxton in a manner consistent with a belief that he was armed and dangerous. To start, Officer Willis makes no claim that he observed a bulge in Mr. Braxton's waistband at any time. Moreover, as the Court can see from the body-worn camera footage, it was Mr.

Braxton who opened his car door in order to show the officers text messages on his phone. The officers never directed Mr. Braxton to stop moving or to show his hands. Officer Willis spoke to Mr. Braxton in close proximity when Mr. Braxton was seated in the vehicle. When Officer Willis ordered Mr. Braxton out of the vehicle and followed him to the side of the trailer, he did not immediately seek to conduct a frisk. To the contrary, he left Officer Nava a fair distance away by the front driver's side door of the SUV and stood with Mr. Braxton alone by the trailer.

There is good reason for this Court not to credit Officer Willis' assertions with respect to any claim of a belief that Mr. Braxton was armed. In the Gerstein affidavit, Officer Willis wrote as follows: "As Defendant Braxton exited the vehicle, Officer Willis observed Defendant Braxton adjusting his black hoodie by pulling it over his waistband. Officer Wilis walked with Defendant Braxton over to the trailer where he continued to observe Defendant Braxton's waistband. Defendant Braxton continued to clutch his hoodie over his waistband." With respect to the first sentence, the Court can observe Mr. Braxton get out of the SUV at approximately 5:04:10 p.m. Mr. Braxton has his cell phone in one hand and, while he still has one foot inside the car, he briefly adjusts his sweatshirt for less than one second. Mr. Braxton *does not* touch his sweatshirt or waistband again, much less continuously, as Officer Willis

swore under oath. Officer Willis' affidavit is simply false. Officer Willis recognized

as much at the preliminary hearing before the Superior Court.[13]

```
 1        Q    Are the facts in that Gerstein still true and
 2   accurate to the best of your knowledge, or are there any
 3   corrections you would like to make?
 4        A    There is a correction I would like to make.
 5        Q    And what is that correction?
 6        A    It's the paragraph -- I don't remember which
 7   paragraph it is.  It's where I state after he exits the
 8   vehicle.  There's a line where I state that he continues to
 9   -- to -- keeps his hoodie like clutched over his waistband.
10   After reviewing my body cam, he doesn't necessarily do that,
11   but he does like blade his body for a good duration, while
12   we were conversating outside the vehicle.
```

Having abandoned the demonstrable falsehood that Mr. Braxton continued to

"clutch" at his waistband, Officer Willis took the position that Mr. Braxton bladed

his body such that he believed Mr. Braxton to be armed and dangerous. To the extent

the Government adopts Officer Willis' *post hoc* notion of "blading," the Court

should consider that Officer Willis does not mention blading at all in the Gerstein

affidavit. And the body-worn camera footage provides clear evidence to refute this

claim. Judges of this Court have rejected the attempts of MPD officers to use

---

[13] *See* Ex. I at 11. The transcript of the preliminary hearing was not provided in discovery. Mr. Braxton obtained it himself.

purported body blading as a justification for Fourth Amendment seizures. *E.g.*, *United States v. Hood*, 435 F. Supp. 3d 1, 8 (D.D.C. 2020) (Huvelle, J.). The positioning of Mr. Braxton's body is consistent with his effort to direct Officer Willis to a small VIN on the side of a trailer oriented perpendicular to the direction of traffic while straddling between a paved alleyway and gravel-filed patch of grass. Simply put, the officers did not have probable cause to believe Mr. Braxton had committed a crime at the time they unlawfully arrested him.

In the alternative, if this Court determines that Mr. Braxton was not arrested at the time the officers grabbed him, the application of physical force nonetheless violates the Fourth Amendment. It is well established that an officer may conduct a *Terry* frisk in the course of a lawful *Terry* stop only where the officer "has reason to believe, based on specific and articulable facts taken together with rational inferences from those facts, that [the officer] is dealing with an armed and dangerous individual." *United States v. Wills*, 316 F. Supp. 3d 437, 444 (D.D.C. 2018) (citations omitted). For the same reasons noted above with respect to probable cause, the officers did not have reasonable articulable suspicion to believe that Mr. Braxton was armed and dangerous at the time they grabbed him. This Court should reject Officer Willis' after-the-fact attempt to justify his constitutionally unreasonable actions.

**VI.     All Evidence Derived from the Unlawful Seizure of Mr. Braxton Must
Be Suppressed**

As a result of the violation of Mr. Braxton's Fourth Amendment right to be

free from unreasonable searches and seizures, this Court should suppress the fruits

of the March 29, 2023 warrantless search and seizure and any evidence derived

therefrom, to include any statements made by Mr. Braxton and any evidence

recovered from the search of Mr. Braxton's vehicle. *E.g.*, *Wong Sun v. United States*,

371 U.S. 471 (1963).

## CONCLUSION

For the reasons stated above and those to be presented at the motions hearing,

this Court should suppress the fruits of the warrantless search and seizure of Mr.

Braxton and all evidence derived therefrom.

Respectfully submitted,

_____/s/_____
Michael E. Lawlor
Adam C. Demetriou
Brennan, McKenna & Lawlor, Chtd.
6305 Ivy Lane, Suite 700
Greenbelt, Maryland 20770
(301) 474-0044

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of July, 2024, the foregoing was served on all parties via ECF.

_____/s/_____
Michael E. Lawlor