**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No.  23-cr-428-BAH** |
| | : | |
| **DONOVAN BRAXTON, JR.** | : | |
| | : | |
| **Defendant.** | : | |

---

## REPLY IN SUPPORT OF MOTION TO SUPPRESS FRUITS OF WARRANTLESS SEARCH AND SEIZURE

Defendant Donovan Braxton ("Mr. Braxton"), by and through his counsel, Michael E. Lawlor, Adam C. Demetriou, and Brennan, McKenna & Lawlor, Chtd., respectfully submits the following Reply in support of his Motion to Suppress Fruits of Warrantless Search and Seizure. In support of its argument that Mr. Braxton was not seized until Officer Willis physically grabbed him, the Government relies upon a number of inapposite or otherwise distinguishable cases. Tellingly, the Government offers no response to Mr. Braxton's arguments that he was seized (1) when Officer Willis directed him to turn off his truck and he complied and (2) that he was seized when Officer Willis directed him to get out of his truck and he complied. Moreover, the Government's *post hoc* argument with respect to the allegedly high-crime nature of the residential area where Mr. Braxton was

1

unlawfully arrested is supported neither by the facts nor by the law. This Court should grant Mr. Braxton's Motion to Suppress.

## I.   Procedural History

On March 29, 2023, in the rear alley of 5026 Sheriff Road in Northeast Washington, D.C., Metropolitan Police Department ("MPD") officers Anthony Willis and Michael Nava executed a warrantless arrest of Donovan Braxton. The officers recovered a firearm from Mr. Braxton's person. On July 16, 2024, Mr. Braxton filed a Motion to Suppress the fruits of the warrantless search and seizure. (ECF No. 19.) On August 19, 2024, the Government filed its Opposition. (ECF No. 21.) A suppression hearing was scheduled for September 13, 2024. On September 12, 2024, the Government filed a Motion for Leave to File an untimely supplement to its Opposition, (ECF No. 23), which Mr. Braxton moved to strike (ECF No. 24). On September 13, 2024, the parties appeared before the Court. The Court indicated that in light of the importance of the matter, it was inclined to permit the parties to submit any filings they deemed necessary. The Court also ruled that it would consider the Government's Supplement (ECF No. 25). Ultimately, in light of the Court's trial schedule, the suppression hearing was rescheduled for October 3, 2024.

II.    **Mr. Braxton Was Seized When the Marked Police Cruiser Came to a Stop Perpendicular to his Vehicle in an Empty Residential Alleyway and Two Uniformed Officers Immediately Engaged Him in Targeted Questioning**

In his Motion, Mr. Braxton argues that he was seized for Fourth Amendment purposes when the officers' "marked police cruiser came to a stop perpendicular to his black SUV in a narrow residential alleyway and the uniformed officers immediately engaged [him] in questioning." (ECF No. 19 at 19.) In response, the Government argues that "Braxton was not seized until Officer Willis placed his hand on Braxton's arm." (ECF No. 21 at 8.) In support of this argument, the Government relies upon a number of cases that present factual scenarios far different from the circumstances of Mr. Braxton's case.

"A Fourth Amendment seizure occurs when physical force is used to restrain movement or when a person submits to an officer's show of authority." *United States v. Delaney*, 955 F.3d 1077, 1081 (D.C. Cir. 2020) (citations omitted). There is no dispute that the officers did not use physical force against Mr. Braxton until Officer Willis grabbed Mr. Braxton's arm. Accordingly, to assess whether Mr. Braxton was seized for Fourth Amendment purposes before the application of physical force, this Court must analyze (1) whether the officers made a show of authority; and, if so, (2) whether Mr. Braxton submitted to the show of authority. *E.g.*, *United States v. Mabry*, 997 F.3d 1239, 1243 (D.C. Cir. 2021) ("Mabry was not physically restrained, so he was seized if and only if (1) the police made a show of authority, and (2) Mabry

3

submitted to that show of authority.") "A show of authority sufficient to constitute a seizure occurs where the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business, or, put another way, where a reasonable person would have believed that he was not free to leave." *Delaney*, 955 F.3d at 1081(internal citations omitted). "[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Id.* at 1084 (citation omitted).

The body-worn camera footage provides clear evidence of the officers' seizure of Mr. Braxton. At 5:01 p.m., Officer Willis turned his marked police cruiser into the residential alleyway where Mr. Braxton's vehicle was stationary with its engine running. Officer Nava was seated in the passenger's seat. Both were wearing MPD uniforms. As Officer Willis drove toward Mr. Braxton's vehicle, which was oriented perpendicular to the direction of traffic, one of the officers stated, "yeah that must be him." The uniformed officers got out of the cruiser. Apart from Mr. Braxton, there was no other person present in the alleyway. Officer Willis called out to Mr. Braxton, who was seated in the driver's seat of his black SUV: "Hey how are you doing, sir? You good? Are you just trying to pull your tractor out?" Both officers approached Mr. Braxton on foot. Officer Willis stated: "Yeah we got a call. Does it

belong to you?" Officer Nava then asks whether Mr. Braxton "just bought it right now." Mr. Braxton then handed Officer Willis a Certificate of Title and asked what the call was about. Officer Nava responded that the officers had received a call about "someone just picking up, I guess, what you're picking up." Officer Willis then studied the Certificate of Title. The officers asked Mr. Braxton for his name. Mr. Braxton responded and provided them with his D.C. driver's license.[1] Mr. Braxton was still the only civilian in the residential alleyway.

In arguing that Mr. Braxton was not seized when the uniformed officers cornered him in an otherwise deserted residential alleyway and began questioning him, the Government relies heavily on cases where members of law enforcement approached individuals who were traveling on common carriers, whether busses or trains, and ultimately questioned those individuals without having given any indication that those specific individuals were the target of the any investigation. In *Florida v. Bostick*, 501 U.S. 429 (1991), two police officers were conducting routine drug interdiction. The uniformed officers boarded a bus bound from Miami to Atlanta during a stopover in Fort Lauderdale. After eyeing several passengers who were present on the bus, the officers, without reasonable suspicion, picked out the defendant and asked to inspect his ticket and identification. The defendant complied

---

[1] Officer Willis kept both the Certificate of Title and Mr. Braxton's driver's license for the entire duration of the seizure and subsequent search.

and both documents were immediately returned to him. The officers explained that they were on the lookout for illegal drugs and asked to search the defendant's luggage. The officers informed the defendant that he had the right to refuse to give consent to search. The defendant ultimately consented to the search, during which the officers found cocaine.

The Florida Supreme Court reversed the trial court's denial of the defendant's motion to suppress, reasoning that "Bostick had been seized because a reasonable passenger in his situation would not have felt free to leave the bus to avoid questioning by the police." *Id*. at 433. The United States Supreme Court reversed that decision, holding that "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. Where the encounter takes place is one factor, but it is not the only one." *Id*. at 437 (citations omitted). However, the Supreme Court "refrain[ed] from deciding whether or not a seizure occurred in this case" because "[t]he trial court made no express findings of fact, and the Florida Supreme Court rested its decision on a single fact -- that the encounter took place on a bus -- rather than on the totality of the circumstances." *Id.* at 437. The limited holding of *Bostick* does not apply to Mr. Braxton's case. Here, at the time the uniformed officers stopped their car perpendicular to Mr. Braxton's, approached him on foot, and began

questioning him, Mr. Braxton was seated in his running, but stopped, SUV in an otherwise empty residential alleyway. He was not a passenger on a bus. Moreover, unlike in *Bostick*, the officers informed Mr. Braxton that they were investigating a call related specifically to him. In other words, the officers did not state that they were merely performing routine neighborhood patrol or drug interdiction. To the contrary, they told Mr. Braxton explicitly that *he* was the subject of an ongoing investigation. The officers did not tell Mr. Braxton that he had the right not to cooperate with their targeted investigation. A reasonable person in Mr. Braxton's position would not have felt free to direct the officers to return to their vehicle and then maneuver out of the alleyway. In remaining seated in his vehicle and answering questions, Mr. Braxton submitted to the officers' show of authority and was therefore seized.

The Government's reliance on *United States v. Drayton*, 536 U.S. 194 (2002), is also misplaced. In that case, Drayton and Brown were seated on a bus traveling from Fort Lauderdale to Detroit. During a stopover in Tallahassee, the bus driver allowed three police officers to board the bus and conduct routine drug interdiction activity. The officers were dressed in plain clothes. One officer remained at the front of the bus while the other two moved towards the back. The officers spoke with several passengers, asking about travel plans and matching items of luggage to their owners. An officer then approached Drayton and Brown, who were seated next to

each other. The officer identified himself as a police officer, displayed his badge, explained generally that he was conducting drug and weapon-related interdiction, and asked the two men about their luggage. Brown consented to a search of his luggage, in which the officer found no contraband. The officer noticed that Brown and Drayton were wearing heavy jackets baggy pants in warm weather. The officer asked Brown for consent to search his person. Brown consented, and the officer found drugs. After Brown was placed under arrest and escorted off the bus, the officer asked Drayton for consent to search his person. Drayton too consented, and the officer found drugs.

The Supreme Court held that Drayton and Brown were not seized when they were questioned by the officers and that there was no requirement that the officers informed the men that they could refuse to consent to a search. In holding that Drayton and Brown were not seized when officers approached them for questioning the Supreme Court noted: "When Officer Lang approached respondents, he did not brandish a weapon or make any intimidating movements. He left the aisle free so that respondents could exit. He spoke to passengers one by one and in a polite, quiet voice. Nothing he said would suggest to a reasonable person that he or she was barred from leaving the bus or otherwise terminating the encounter." *Id.* at 203-04. The Supreme Court also relied upon the location of the encounter – a bus – to hold that the officers' questioning did not constitute an illegal seizure: "The fact that an

encounter takes place on a bus does not on its own transform standard police questioning of citizens into an illegal seizure. Indeed, because many fellow passengers are present to witness officers' conduct, a reasonable person may feel even more secure in his or her decision not to cooperate with police on a bus than in other circumstances." *Id.* at 204 (internal citation omitted).

As with *Bostick*, the facts of *Drayton* are not analogous to Mr. Braxton's case. The *Drayton* defendants were seated among several other passengers aboard a common carrier. The officers boarded the bus and spoke with other passengers before approaching Drayton and Brown. After approaching the two men, the officer informed them that he was performing routine interdiction. He *did not* indicate that Drayton and Brown were the targets of any specific investigation. In Mr. Braxton's case, a marked police cruiser came to a stop perpendicular to Mr. Braxton's stopped SUV in an otherwise empty residential alleyway. The uniformed officers got out of their car and immediately engaged Mr. Braxton. It was clear from the outset that Mr. Braxton was the focus of police activity. Officers Willis and Nava did not indicate that they were performing routine interdiction. They informed Mr. Braxton that they had received a call *about him* and the trailer he was moving. Here, there were no other citizens present to witness the encounter. Where the officers came to a stop in an otherwise empty residential alleyway in front of Mr. Braxton's vehicle and engaged him in targeted questioning that made clear that he was the subject of an

investigation, a reasonable person in Mr. Braxton's position would not have felt at liberty to terminate the encounter and drive away.

The Government next attempts to distinguish *Delaney*, 955 F.3d 1077, in which the D.C. Circuit reversed the denial of a motion to suppress. In *Delaney*, the Circuit rejected the Government's arguments and found that a Fourth Amendment seizure occurred where: (1) officers parked their cruiser just over three feet away from the nose of the defendant's vehicle such that the vehicle would have had to execute a number of turns to get out of a parking lot; (2) upon entering the parking lot, the officers directed their takedown lights on the defendant's vehicle; and (3) the seizure occurred at night in a dimly lit, narrow parking lot. *Id.* at 1082-83. As the Court concluded, "[t]aken together, then, the officers' conduct—pulling into the narrow parking lot at night; training the take-down light on the Jeep; and, most importantly, parking their cruiser within a few feet of the Jeep's nose—amounted to a show of authority that would have communicated to a reasonable person in Delaney's position that he was not at liberty to ignore the police presence and go about his business." *Id.* at 1083.

The Government relies on *United States v. Johnson*, 212 F.3d 1313 (D.C. Cir. 2000) to argue that Officer Willis stopped his car at too great a distance from Mr. Braxton's to constitute a show of authority. The *Johnson* defendant argued *for the first time in his reply brief on appeal* that officers seized him when they pulled into

a parking lot because they blocked his car with their own. In rejecting this argument, the D.C. Circuit noted that the factual record did not support the claim because an officer testified that he stopped about 25 feet away from Johnson's vehicle, which, under the circumstances of that case, was not close enough to block the vehicle. *Id.* at 1317. "More importantly," however, the Circuit rejected the argument because: (1) Johnson did not present the argument before the district court; (2) Johnson did not raise the argument until his reply brief; and (3) Johnson's motion to suppress was "flatly inconsistent" with this theory. *Id.*

Here, Officer Willis' cruiser came to a stop much closer than 25 feet from Mr. Braxton's vehicle. At the preliminary hearing before the Superior Court, counsel for Mr. Braxton asked Officer Willis about his distance from the SUV at the time he claimed to have seen Mr. Braxton's eyes widen.[2] Officer Willis testified that he was sitting inside his vehicle when he saw Mr. Braxton's eyes. (ECF No. 19-9 at 17.[3]) When asked to approximate his distance from Mr. Braxton at that time, Officer Willis claimed not to be "great with distance" but noted that the distance from which he allegedly saw Mr. Braxton's eyes widen was roughly equivalent to the distance between where he was seated in court and the bar behind the attorneys. *Id.* at 17-18 ("right before the pews, the wooden panel right there"). The Court accepted

---

[2] As the Court will recall, Mr. Braxton was wearing sunglasses.

[3] Page numbers for the preliminary hearing transcript reflect the pagination on the transcript itself, not the ECF-generated header.

counsel's approximation that Officer Willis was around 12 feet away from Mr. Braxton when the officer, while seated in his car, allegedly saw Mr. Braxton's eyes widen. 12 feet is a far shorter distance than 25 feet. Moreover, unlike in *Johnson*, Mr. Braxton has raised this argument before the district court. *Johnson* therefore provides no support for the Government's argument.

The Government next relies on *United States v. Goddard*, 491 F.3d 457 (D.C. Cir. 2007), a case in which the Circuit held that officers did not seize a group of *pedestrians* where the officers came to a stop 15 to 20 feet away from the group. In that case, four officers were riding together in one car. The officers pulled into a gas station where they had observed a group of men. All four officers got out of the car and approached the group. One member of the group attempted to walk away. Before any of the officers had said anything to the group, one officer heard Goddard state that he had a gun. That officer then shouted that there was a gun, another officer ordered one of the men to return, and the other officers grabbed and searched Goddard. The D.C. Circuit held that no seizure occurred until an officer yelled "gun" and ordered one of the men to return to the group.

*Goddard* has no bearing on Mr. Braxton's case. Mr. Braxton was *not* a pedestrian standing outside of a business. He was a motorist seated in the driver's seat of a vehicle that was stopped in an empty residential alleyway. Officer Willis came to a stop close to Mr. Braxton's car and immediately engaged him with

questions. As noted above, the officers explicitly stated that they were investigating Mr. Braxton. By contrast, in *Goddard*, the officers said *nothing* to the group of men until one officer overheard Goddard admit that he had a firearm.

The Government's other attempts to distinguish *Delaney* fail.[4] Not only did the *Delaney* Court rely upon the close distance from which the police stopped their car in relation to the defendant's car, but the Court also relied on other circumstances. In *Delaney*, the officers focused their takedown lights on the defendant's car. Here, there was need for takedown lights or sirens: immediately upon coming to a stop, Officer Willis stepped out of the car and verbally called out to Mr. Braxton. A reasonable person seated in a stopped but running car would not feel free to leave when a police car has just come to a stop a short distance away and an officer has stepped out of his vehicle to address the sole occupant of a residential alleyway. The *Delaney* Court also looked at the time and place of the encounter. Here, officers encountered Mr. Braxton in a narrow, otherwise deserted, residential alleyway – not outside of a business, not in a parking lot, not on a bus. These

---

[4] In *Delaney*, the Government relied heavily upon drug interdiction cases. The *Delaney* Court criticized this reliance as "misplaced" because by "pull[ing] the police cruiser to a stop in the parking lot's exit lane and activating their take-down light, the officers made clear that this was not a routine encounter, but one targeted at [Delaney]. Thus, however 'natural' the cruiser's stopping position, the officers' 'targeted' conduct toward Delaney indicated that he was not free to ignore their presence." 955 F.3d at 1084 (internal citations omitted). Here, too, the Government's reliance upon drug interdiction cases is misplaced.

circumstances are indicative of a stop. The sole occupant of the alleyway would not have felt free to ignore the presence of two uniformed officers approaching his vehicle.

The Government next argues that Mr. Braxton was not seized for Fourth Amendment purposes when the officers took and retained his driver's license and Certificate of Title. The cases the Government cites support *Mr. Braxton's* argument. In *United States v. Tavolacci*, 895 F.2d 1423 (D.C. Cir. 1990), Amtrak Police checked passenger reservation records and identified the defendant as a potential drug courier. The defendant was traveling by train from Florida to Chicago via Washington, D.C. Three officers watched as the defendant switched trains at Union Station and approached him at the door of his sleeper compartment after he boarded the train to Chicago. An officer approached the open door of the defendant's roomette, identified himself, and asked permission to question to the defendant. The defendant answered "sure." *Id*. at 1425. The officer requested the defendant's ticket, which the defendant provided. The officer then asked for photo identification, in response to which the defendant asked what the questioning was about. The officer then gave his standard "spiel" – that he was with a drug interdiction unit investigating narcotics. *Id*. The defendant then produced a license in a name different from the name on the ticket. The D.C. Circuit declined to find a seizure where the officer asked for the defendant's ticket and then his ID along with the retention of

14

the ticket while requesting the ID because "the production of the ticket and the license could not have been separated by more than a few moments. The only act separating the requests for tickets and identification was detective Beard's 'spiel' as to his duties, delivered in response to Tavolacci's question and without specific characterization of Tavolacci as a suspect. Such descriptions by themselves are neutral in the contact/detention inquiry." *Id.* at 1426.

These circumstances are inconsistent with those presented in Mr. Braxton's case. Again, Mr. Braxton was not a passenger located in an open compartment on a common carrier. He was a motorist seated in a stopped but running vehicle located in an otherwise empty residential alleyway. The defendant in *Tavolacci* could see at most only the interviewing detective and the head of one other officer in the hallway. Here, two uniformed officers focused themselves immediately upon Mr. Braxton. Most importantly, the sequence of events distinguishes Mr. Braxton's case from *Tavolacci*. The officers informed Mr. Braxton that they were responding to a call as soon as they began approaching him. As Mr. Braxton handed Officer Willis the Certificate of Title, Officer Nava explained that the officers had received a call specifically about what *Mr. Braxton* was picking up. The officers then asked for Mr. Braxton's identification and retained both documents. At the time Mr. Braxton provided the documentation, the officers had made clear that they were investigating *him*. They did not offer a generic spiel as in *Tavolacci*. A reasonable person, having

been informed that the police were investigating him and having received a request on the part of the officers for identifying information, would not have felt at liberty to send the officers on their way and leave the scene. Mr. Braxton submitted to the officers' shows of authority, complied with their directives, and remained in place.

The Government also cites *Florida v. Royer*, 460 U.S. 491 (1983), for the erroneous proposition that Mr. Braxton was not seized when the officers took and retained his driver's license and Certificate of Title. The Government's citation is incomplete and misleading. In *Royer*, the Supreme Court affirmed the Florida District Court of Appeal's conclusion that a man was illegally detained when he consented to a search of his luggage. In that case, two plainclothes officers observed Royer at Miami International Airport. The officers believed that Royer fit the profile of a drug courier. The officers approached Royer, identified themselves, and asked to speak with him. Upon request, Royer produced his airline ticket and driver's license. The names on the two did not match. The officers then told Royer that they were narcotics investigators and had reason to suspect him of transporting narcotics. The officers did not return the ticket and identification. Instead, they asked Royer to step aside with them to a nearby room. Officers ultimately searched Royer's luggage and recovered marijuana.

In its Opposition, the Government cites the following passage from *Royer* in a parenthetical: "Asking for and examining Royer's ticket and his driver's license

16

were no doubt permissible in themselves." (ECF No. 21 at 11 (citing *Florida v. Royer*, 460 U.S. 491, 501 (1983)). The Government ignores the context of this passage, in which the Supreme Court labeled the State's argument that the entire encounter was consensual as "untenable." 460 U.S. at 501. Moreover, the Government implies through its citation that it has reproduced an entire sentence from the Supreme Court's opinion, but that is not the case. The full sentence reads as follows: "Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, **but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.**" *Id*. (emphasis added). The Government has omitted from its citation information that was essential to the Supreme Court's holding. The circumstances in *Royer* support the grant of Mr. Braxton's Motion to Suppress. Here, the officers told Mr. Braxton, who was alone in an alleyway, that they were responding to a call. The officers took and retained Mr. Braxton's Certificate of Title and then told him that the were investigating a call specifically related to what *Mr. Braxton* was doing. The officers then took and retained Mr. Braxton's driver's license. The officers next directed Mr. Braxton to turn off the car and then to step out of the car. The officers

never indicated that Mr. Braxton was free to depart. *Royer* supports the conclusion that Mr. Braxton was seized well before Officer Willis placed his hands on him.[5]

The Government has not come forward with a single case to support its argument that Mr. Braxton was not seized at the time the two uniformed officers came to a stop in a marked police cruiser mere feet away from where Mr. Braxton was seated in his vehicle in a deserted alleyway, called out to him, informed him that he was under investigation, and took and retained his driver's license and Certificate of Title. In the face of such a show of authority, no reasonable person would have felt free to send the officers on their way and depart from the scene. The Government has *not* argued that the officers possessed the requisite degree of reasonable articulable suspicion or probable cause sufficient to support a Fourth Amendment seizure at any time *before* Officer Willis touched Mr. Braxton. *See* ECF No. 21 at 12-14 (arguing only that officers had reasonable articulable suspicion of criminal activity "[a]t the moment Officer Willis touched Braxton").[6] Even with respect to

---

[5] The Government's reliance on *United States v. Gross*, 784 F.3d 784 (D.C. Cir. 2015), is also misplaced. There, the D.C. Circuit held that a *pedestrian* was not seized when officers followed him in a police car and asked whether he had a gun. Mr. Braxton was not a pedestrian. He was a motorist who was cornered in a narrow, residential alleyway. The officers did not *accuse* Gross of having a firearm. They asked if in fact he did have one. Here, when they got out of the car after having stopped a short distance from Mr. Braxton's vehicle, the officers told Mr. Braxton that they were specifically investigating *him*.

[6] The Government appears to have bought into Officer Willis' *post hoc* notion of body blading. As argued in the Motion and as is clear from the body-worn camera

that moment, the Government's argument fails. The circumstances noted by the Government in its Opposition do not amount to reasonable articulable suspicion to believe that Mr. Braxton was armed, a requirement for a lawful *Terry* frisk. *See, e.g.*, *United States v. Askew*, 529 F.3d 1119, 1147 (D.C. Cir. 2008) (noting that "a Terry frisk (i.e., search) requires reasonable suspicion that the stopped individual may have a weapon. If there were no meaningful distinction between searches and seizures, then police would be justified in frisking every person they stopped, yet this is not what the law allows.") (internal citation omitted).

The anonymous 911 call contains no mention of a firearm or shots having been fired. Mr. Braxton's location in an alleyway where an anonymous called reported the mere *possibility* of some activity involving either a stolen trailer or a stolen truck certainly does not support a belief that Mr. Braxton was armed. Officer Willis himself observed Mr. Braxton at a close distance as he questioned him next to the driver's side of the SUV. As noted below, Officer Willis observed nothing to indicate that Mr. Braxton was armed. That Mr. Braxton, after having stood up from a seated position, briefly adjusted his clothing in no way indicates that he was armed. If Officer Willis truly believed that minor adjustment was an attempt to hide a weapon, he would not have walked back behind the truck with Mr. Braxton alone,

---

footage, the officer's contention of body blading is simply not supported by the evidence.

leaving his partner at the driver's side door. Mr. Braxton *did not* blade his body. He stood in front of the VIN number and indicated its location to the officer. That Mr. Braxton declined to consent to a search of his person, as is his right, does not provide a basis to believe he was armed. This Court should grant Mr. Braxton's Motion to Suppress.

**III.     The Government Offers No Response to Mr. Braxton's Arguments that He Was Seized (1) When Officer Willis Directed Him to Turn Off the Car and (2) When Officer Willis Directed Mr. Braxton to Get Out of the Car**

While Mr. Braxton maintains that he was seized at the point when the officers came to a stop perpendicular to his vehicle, indicated that they had received a call about him, and took and retained his driver's license and Certificate of Title, Mr. Braxton also identified additional, subsequent shows of authority that are indicative of a Fourth Amendment seizure. Specifically, Mr. Braxton argues that he was seized when Officer Willis directed him to turn off his SUV and he complied (ECF No. 19 at 22) and when Officer Willis directed him to step outside the SUV and he complied (*Id.* at 22-23.) The Government has offered no specific argument in response to these points. Nor has the Government argued that the officers possessed reasonable suspicion or probable cause to support a seizure at any point before they used physical force against Mr. Braxton. By its silence, the Government has conceded these arguments.

**IV.    The Government's Newly Proffered "High-Crime Area" Claim Has No Basis in Fact or Law**

As noted above, on September 12, 2024, the evening before the previously scheduled motions hearing date, the Government filed a Supplement to its Opposition. In its simultaneously submitted Motion for Leave to File (ECF No. 23), the Government represented that earlier in the day on September 12, it spoke with Officer Willis, who stated that "the area in which Mr. Braxton was stopped was an area in which shootings were regularly reported." (ECF No. 23 at 1.) The Government acknowledged that Officer Willis had never made this claim in the many statements he has given in relation to this case. *Id*.; *see also* ECF No. 24 at 3-4 (listing Officer Willis' prior statements). The Government argues that the purported "high crime" nature of area provides justification for its claim that the officers had reasonable articulable suspicion to believe Mr. Braxton was armed when Officer Willis grabbed him.[7] The Government has attached to its Supplement

---

[7] The Government cites a single case in its Supplement: *United States v. Edmonds*, 240 F.3d 55 (D.C. Cir. 2001). However, in that case, the D.C. Circuit affirmed the denial of a motion to suppress where, around 7 p.m., the defendant was seated in the driver's seat of a van located in the parking of a school – a site specifically known for numerous drug transactions – and, as an officer approached the van, the defendant made furtive movements. Notably, the defendant's passenger rapidly fled to the van after having observed the same officer moments earlier. Mr. Braxton, however, was seated in an SUV in a residential alleyway. As noted below, Mr. Braxton made no furtive gestures. Officer Willis had no reason to believe there was *any contraband* in Mr. Braxton's vehicle. Nor did Mr. Braxton flee. Mr. Braxton also notes that the district court in *Edmonds* found that the defendant, who like Mr. Braxton was seated in a stopped vehicle, was seized "within the meaning of the

excerpts from police reports of five incidents that occurred in or near the 5000 block of Sheriff Road, Northeast within a period of more than six months before Mr. Braxton's arrest.

As set forth in the Motion to Strike, Officer Willis' belated "high-crime area" claim is of dubious credibility, especially when considered next to the fact that at the Superior Court preliminary hearing, Officer Willis retracted a demonstrable falsehood to which he swore in his Gerstein Affidavit. (ECF No. 24 at 3-4.) But even considered on its merits, the Government's Supplement does not render the officers' actions lawful.

As noted above, the Government has never argued that the officers possessed reasonable articulable suspicion or probable cause sufficient to support a seizure *at any time before* Officer Willis physically grabbed Mr. Braxton. In other words, to the extent this Court concludes that Mr. Braxton was seized at any point when the officers came to a stop close to Mr. Braxton's vehicle, informed him that he was under investigation, took custody of his driver's license and Certificate of Title, ordered him to turn off his car, and ordered him to step out of his car, the Court should grant Mr. Braxton's Motion to Suppress. Moreover, Officer Willis has

---

Fourth Amendment at the moment [the officer] asked him for his license and registration." 240 F.3d at 58.

already testified that he had no reason to believe Mr. Braxton was armed when he

first arrived in the alleyway.

> Q: Now, officer the 911 call didn't mention anything about a gun, correct?
>
> A: No, no.
>
> Q: Nothing about gunshots either?
>
> A: No.
>
> Q: And so beyond a suspicious person moving a trailer out of a yard, that's all you knew about this 911 call, correct?
>
> A: Correct, correct.
>
> Q: Now, when you first arrived in this alley on Sheriff Road, you had not [sic] reason to believe that Mr. Braxton, or the person you later learned was Mr. Braxton, was carrying a firearm, correct?
>
> A: When I first got there?
>
> Q: When you first arrived, correct.
>
> A: No – I mean, no, not necessarily, no."

*See* ECF No. 19-9 at 14.

Officer Willis also testified that he had no reason to believe Mr. Braxton was

armed at the time he was questioning Mr. Braxton at the driver's side of the SUV:

> "Q: You didn't see him putting anything in his pockets while you were standing at the door of the truck?
>
> A: No.
>
> Q: And you didn't see a bulge or a shape that was consistent with a firearm while you were standing at the driver's side of the truck?
>
> A: No.

Q: Now, while Mr. Braxton was sitting in the truck, there was nothing that caused you to believe, or he did nothing that caused you to believe he was carrying a firearm, correct?

A: No. The only thing at that point I had was his initial reaction when we pulled into the – pulled into the alleyway."

*See* ECF No. 19-9 at 23. The Government does not claim that Officer Willis and Nava had reason to believe that Mr. Braxton was armed at any time before he got out of the SUV.

With this background in mind, the excerpted police reports supplied by the Government bear no relevance to this case. Exhibit 6 relates to an "unfounded" allegation of an armed carjacking from September 5, 2022 at 5172 Sheriff Road. The incident occurred after 1 a.m. The narrative section contains *no mention* of a firearm or any shooting and does not recount the nature of the call for service. Exhibit 7 relates to an assault with a firearm that occurred on October 13, 2022 at some point between 2 p.m. and 10 p.m. The officers responded to a call for gunshots and found ballistics evidence at the scene. A shooting victim later reported to the hospital. Exhibit 8 relates to a warrantless arrest on December 1, 2022 at 3:47 p.m. in which officers recovered a firearm. However, there was no *shooting* reported in connection with this incident. Rather, officers were conducting firearms interdiction encountered a man who allegedly displayed characteristics of an armed person. Exhibit 9 relates to an uncorroborated and anonymous report of gunshots on February 2, 2023 at around 8 p.m. When they arrived on scene, the officers found

24

*no evidence* suggesting that there had in fact been any shooting. Exhibit 10 relates to a homicide that occurred at 6:35 p.m. on February 26, 2023 at 5134 Sheriff Road. Exhibits 6, 8, and 9 all relate to instances in which no evidence of a shooting was found. The incident in Exhibit 7 occurred more than *five months before* Mr. Braxton's arrest. It is unclear how these disparate and remote in time reports of alleged crimes bear on the analysis in Mr. Braxton's case when the Government has already conceded that at no point before Officer Willis cornered Mr. Braxton behind the SUV did the officers have any arguable reason to believe that Mr. Braxton was armed.[8] Nor could they have made such a claim. Just before 5 p.m. on a Wednesday afternoon, officers responded to an anonymous report of an SUV *possibly* getting ready to steal a car or that was *possibly* stolen itself. The 911 call contained no mention of a firearm or gunshots. And as explained above and in his Motion, at no point before seizing Mr. Braxton did the officers have reason to believe he was armed. The Court should reject the Government's last-minute effort to justify the officers' unconstitutional actions.

---

[8] It is also unclear whether Officer Willis was even aware of the incidents referenced in the exhibits to the Supplement.

## CONCLUSION

For the reasons stated above and in the Motion to Suppress, as well as those to be presented at the motions hearing, this Court should suppress the fruits of the warrantless search and seizure of Mr. Braxton and all evidence derived therefrom.

Respectfully submitted,

_____/s/_____
Michael E. Lawlor
Adam C. Demetriou
Brennan, McKenna & Lawlor, Chtd.
6305 Ivy Lane, Suite 700
Greenbelt, Maryland 20770
(301) 474-0044

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of October, 2024, the foregoing was served on all parties via ECF.

_____/s/_____
Michael E. Lawlor